Good morning, your honors. I'd like to reserve three minutes for rebuttal, please. May it please the court, my name is Jason Campbell. I represent petitioner appellant Kenneth York. Mr. York is currently serving a life without parole sentence based upon the murder of Merlin Fidler during a robbery. It's indisputable that Mr. York was not the shooter. The issue is whether he was the shooter. As pointed out in the briefs, the other likely candidate for having been the second intruder in this robbery was the state star witness Mr. Junior Perez. When you, the district court has already agreed with Mr. York that there were two aspects of trial counsel's performance that were deficient. First being the presentation of the phone records, Mr. York's phone records, which showed a that there was no 3 a.m. phone call. The next being the presentation of alibi witnesses on behalf of Mr. York that trial counsel did not invest, not only did he not present those witnesses, he didn't investigate or interview any of them that may have provided an alternate story, an alternate narrative for the jurors to follow. So when you take that, those two aspects of deficient performance and you start looking at the prejudice, the cases that we've cited in the case law in general says that when you have an overwhelming case against someone and there's overwhelming evidence of guilt, well, then errors such as these become less relevant. And I would submit to the court that this is certainly not one of those cases where there's overwhelming evidence of guilt. It seems to me the biggest problem on the prejudice is that one has to discount not only Perez, but everyone associated with him, particularly his sister who says that York confessed to him in order to wash out what is pretty strong evidence if you believe it, right? I mean, essentially, you're saying that certainly the cell phone evidence at least is quite disturbing and important, but does that mean that it also had anything to do with Perez, which includes his sister, his brother-in-law, his wife, and so on, and is therefore negated? Well, the primary witnesses who offered inculpatory evidence regarding York are Perez himself, his then-girlfriend, and then by the time of trial, wife, Lauren Lackey Perez, his sister, Tessie Perez, which Your Honor is referring to. And I think the issue with her is that not only did she have an incentive to help her brother, but she also, the relationship between Tessie Perez and Mr. York was volatile and ended very nastily. So she may have also harbored an animus toward Mr. York, independent of her desire to protect her brother. So, you know, while those witnesses, obviously they testified under oath, they made statements. When you set those to the side, what's remaining, there's nothing that is, in our view, more demonstrative of Mr. York's guilt than potentially being demonstrative of Mr. Perez's. And I believe that had the State wanted to, the State could have gone to trial against Mr. Perez on virtually identical evidence aside from the three core witnesses that were surrounding Perez. Do you have any understanding of what happened to the Perez phone records? It sounds like the prosecution or the police tried to obtain them, but then just never did? That's my understanding. We have not been able to find out what, why that happened. Obviously, you know, the case was cold for several years. So, you know, the effort to obtain the records was, I think, three years after the robbery taking place. Perez changed his number a number of times, including two days... Why didn't they obtain York's records at the time? That's right. So the question is, why didn't they obtain Perez's? And that I don't know. I mean, to me, that's one of the major issues with this case, and I don't know if it was police... No, I appreciate your argument that, in fact, these four witnesses in Nevada City could have testified against Perez just like they could have testified against Mr. York. But their observations of Mr. York's conduct is clearly corroborative of at least some engagement in the criminal activity, isn't it? Regardless of whether Perez was involved or not. I mean, one theory is that perhaps both of them were involved, I suppose. But the important question is whether those four witnesses corroborated conduct, observations of conduct which are consistent with criminal behavior. And I understand the question. I believe that that conduct is, if anything, could also be construed as Mr. York going to the property to help his buddy out who just got himself in a nasty situation the night before. You know, the fact is that the witnesses all said that both of the two men were very shaken up, upset, angry. You know, there's a whole host of emotions that were described... But is there any explanation for why York would ask Perez to take the bag to Nevada City? Well, I mean, you know, I think... I mean, your version is that it was really Perez's bag, it wasn't my bag. Right. I believe that Perez had the bag to begin with. I don't believe York did ask him to take that bag. I think that's the importance of the... But did Perez ever give an explanation for that? Not to my knowledge. I don't believe that there was, you know, that's the whole call. The 3 a.m. call was the way that Perez was able to explain away his arriving up there with the bag. And if that 3 a.m. call didn't happen, it pierces the veil of his alibi, which... And the reason you... Your evidence for the fact that that call would have been on York's phone, cell phone, is essentially that... That what? I mean, it could have been from something else. Well, if you look in... It's true. It could have been, theoretically. But if you look at the context of the police interview, this is an important point. We... It's... You know, the transcripts are in the excerpts of record, and I also quoted a passage of it in the brief. But if you look at the context, the police are asking Mr. Perez about this call, very pointedly about this call. And he... And they ask him what his cell phone was. I mean, he said specifically, I got the call on my cell phone. Perez says that. And in the same breath, he's telling them what York's cell phone number is. He also says that he saw multiple missed calls from York that night, which would... It was circumstantial evidence that he saw that missed number, Mr. York's missed number. So I think that the context of that... And didn't he say they communicated by cell phone? Isn't there a statement that, in general, they communicated by cell phone? That's correct. And he disavowed any other forms of communication. I have two and a half minutes left, and let's... Let me just ask you about Penny Morales, because you left out her testimony as well. Mother figure for your client. Your client makes various statements about being involved in a home invasion and being wanted and turned on by someone. That was powerful testimony by someone who was clearly aligned with your client. How do you respond to that? That's true. She was the one witness who was definitely supportive of Mr. York. She only testified after being given a threat that she might be prosecuted. If you look at her testimony, I would ask the court to please review the testimony, particularly Brian Hart and Penny Morales. First of all, she was uncertain of when this supposed home invasion occurred. It's very clear that by the time she enters into Mr. York's life, he is on the run. I mean, as Your Honors have pointed out, he was assisting with the disposal of he was involved in it, whether it was at the time being there, a part of the robbery or after the fact. If you acknowledge that, I mean, the first part of the statement is, I was involved in a home invasion. Second, I'm on the run. So if you make those two connections, then basically what you're saying is that he has said he's involved in a home invasion, which resulted being on the run. And if he's on the run for this particular offense, the home invasion relates to this particular offense, doesn't it? Well, it could. I mean, I think that's the problem. Her statements are so vague that in my view, I mean, I question whether or not those statements were specific enough to even be allowed as evidence in this case. But even if you take those statements, I don't believe they overcome the damage done by the deficient performance, which I think is the real issue. If you take all of the statements, all four of the witnesses at Nevada City and I still don't think that because it was so vague, I think a jury would have had serious doubts about that, about this. She said that he said that somebody ratted him out or pointed the finger at him. Was that, she didn't say when he said that. She didn't say when or who it was. She said it was a childhood friend. I mean, this, by this time. But was he arrested soon? It was, in fact, not Perez who first implicated him. It was Marco Cabrera, a good friend of Perez's. That was some years after the event. That's right. It's about three years. And we don't know how, was there a period that he, once that happened, was he arrested soon after that? I believe within several months. It wasn't right away. I think there was some. The conversation with her could have been during that time period. That's correct. It could have been. And I think that that's one of the, the timeline at that point is a little bit vague. But I think that if you look at the testimony, one of the things that's odd is that she says pointed the finger, which pointed the finger doesn't carry this implication of guilt necessarily. The prosecutor is the one who started introducing the language ratted me out. Ratted me out is a more inculpatory way of describing it. Those are subtle distinctions, but pointing a finger and ratting you out, that's a subtle legal distinction. And, well, by the time you get to the closing argument, I believe the prosecutor is using them interchangeably. But if you look at Penny Morales' testimony, she's talking about pointing the finger. And actually the prosecutor says, didn't you say ratted him out? She says, no, I said pointing the finger. You know, you talked about the weight of the ineffective assistance of counsel, in particular on the alibi. The alibi defense is really difficult here because it's coming theoretically to the lawyer from the mother, that same person who was present at a meeting with various witnesses who basically said, who told them what to do to make sure they wouldn't be arrested, right? Her testimony is really subject to cross-examination, which impacts, doesn't the value of the alibi defense? Sure. You know, I think that it could very well have impacted the value of it. The grandmother obviously wasn't there for that meeting. But at that point, I think it's pretty apparent that Junior Perez, Kenneth York were very close friends. Obviously, Tessie Perez was York's girlfriend at the time. And then you have Lauren Lackey. They were all, they all felt like they were in it together. And I think that that was, that's the impression that you get when discussing Mrs. York's involvement in this, is that it was an effort to try and help all of these four kids, help might not be the right word, but avoid penalties. So I don't necessarily think that that would preclude the presentation of the alibi. In the end, it would be up to the jury. I think you have biased witnesses on this side for Perez, biased witnesses on this side for Mr. York. You know, and then you also, with the 3 a.m. call, the 3 a.m. call, the lack thereof in the phone records, in my view, is far more damaging than Jeanette York's statements to the four kids at the time. I mean, yeah. Okay. Your time's up. I'll give you, I'm sorry, a minute of rebuttal. Thank you. Thank you very much, Your Honor. Good morning, Your Honors. Appellant's reply and argument illustrate the fundamental flaw behind his petition, which is that this Court does not sit in de novo review, or as a 13th juror, as it were, on the trial to ask whether the evidence was sufficient or whether it would decide in the first instance whether there was prejudice under Strickland. Rather, the question under AEDPA review is, could or would a reasonable and fair-minded jurist be compelled to believe there was prejudice in this case from the ineffective assistance? The prejudice standard is a reasonable probability that the jury would have decided otherwise. Correct, which is the result. But, sorry. So, I mean, it's, you know, a substantial burden, but it's not a very high one. And this, the, let's leave the grandmother aside, but the 3 a.m. phone call is critical to the story, to Perez's story. It was certainly important, Judge Berzon, and, but the one thing I would like to interject here is that the question here, though, is not simply whether Strickland is satisfied. It's whether reasonable and fair-minded jurist could disagree about whether there was prejudice for at least four reasons. There were four compelling reasons why you couldn't find unequivocally that there was prejudice here. Can I just back up one minute? Absolutely. About the 3 o'clock, about the importance of the phone call. I understand you're going to go into what other evidence there was, but in terms  of the phone call, the prosecutor told the jury there were no phone records, which was not true. That's right. So it's not only that, that the, it's not only an IAC problem, but it's that, with regard to introducing the phone records, but also as a result of it, the jury was allowed to believe that the phone records didn't exist, and they asked about it, moreover. They did ask about the phone records, Judge Berzon. I think one could interpret the prosecutor's response as just being that there's not that the papers didn't exist, but rather that there were no phone records that would confirm or deny the story. But that's not true. I mean, at least, I mean, we do have the missing Perez phone records, but if we take the testimony that they communicated by cell phone, then it's not true that there were no phone records that undermine the story. If you interpret the testimony the way Appellant does, that they did communicate that York communicated to Perez by cell phone, then yes, that's true, Judge Friedland. But I think as the panel's questioning indicated, that's not unequivocally what Perez said. Perez might have even thought that the communication was coming by cell phone because that's how they normally communicated. But it's possible that York contacted him from another phone because he was trying not to use a cell phone, and that Perez just assumed that it was from his cell phone. Well, except didn't Perez also say that there were several earlier calls that he didn't pick up from him, which he only would have known if the cell phone number was on it? That's one possibility, Judge Berzon. The other possibility is that York told him, oh, I've been trying to call you, what's going on, and that he, again, it's not true. Oh, he didn't say that I saw them, that I saw these numbers? He might have said that he saw them, but, again, I don't think there's any – I think that, at the very least, the absence of the phone records unquestionably shows that parts of Perez's testimony were not accurate. I think that is absolutely true, Judge Berzon. But that, again, has to be weighed in light of the other evidence here. But the fact that a juror, at least one juror, maybe it was collectively, they asked this question about the phone records, doesn't that suggest that the jury cared about the phone records, and if they had gotten the phone records, they might have thought something else? How can we view that otherwise? Judge Friedland, it's absolutely true that the jury's note indicated that was a factor in their analysis. I do believe, however, and, again, I think a reasonable, fair-minded jurist could conclude that, in light of the other evidence, they still would have reached the same verdict. Sotomayor, did the jury ask anything else? Was that the only question they asked? That I'm aware of, Judge Berzon. I mean, it suggests that they thought that was pretty important, right? So it's kind of a leap to say, well, they bothered to ask this question, but actually they didn't really care about it. It doesn't really go to whether they had a reasonable doubt? I think, again, Judge Friedland, there is a gap between saying they didn't care about it and saying they thought it was dispositive. And I think that's sort of the ground that we find ourselves in. Anyway, why don't we let you get to your four points? Of course. Thank you, Judge Berzon. I appreciate it. The first one is, Judge Sessions indicated there were corroborating witnesses at Nevada City. And I think the witness who moved Judge Chen the most in denying the petition was Mr. Hart. And Appellant makes this argument that Hart actually was not an unbiased witness, but if you read his transcript, that simply doesn't borne out. But Hart doesn't place York at the apartment, does he? What Hart says is that Appellant told him, first of all, he says that he got into shit that went bad. In other words, he didn't just say shit went bad. He said, I, being Appellant, got into shit that went bad. That, again, I think clearly indicates his presence at the scene. The second thing that he said was that he was with the NIG when it went down. The NIG in this case, I think everyone agrees, is Mr. Moorhead. And so he was there when it went down. Now, that did occur a half a day later, but the when it went down, I think, again, a jury could reasonably infer that that was he was talking about, the robbery. Not only that, but this is not just my reading of the transcript, Judge Friedland. This is also reading of the transcript by the District Court of Appeals and by Judge Chen. And not a clearly erroneous factual finding to say that that's what Hart was – that's what Hart heard Appellant say, that Appellant was there with Mr. Moorhead when the shit went down. I think that, given that Hart's statement is actually inculpatory, he's not a biased witness. If you read the transcript of his testimony, he's clearly actually a hostile witness. The prosecutor really had to work on Mr. Hart to get out the testimony that he wanted from him. So we have an unbiased witness making inculpatory statements about Appellant. On top of that, as Judge Berzon indicated, there, frankly, there's nothing inculpatory against Perez from Ms. Mignola's testimony or from the other testimony that's going to appear. There is a testimony that calls into question his alibi, but nothing placing him at the scene. In contrast, not only did Hart have testimony that placed York at the scene, but, in fact, so did Perez's sister and his wife. So we have inculpatory evidence. The weight of the evidence was still far more in favor of placing York at that scene rather than Perez. The third thing I would ask the panel to look at is the post-crime conduct. And I'm thinking of two things in particular. First of all, York is the one who gets rid of the gun. York is the one who burns the clothes. And York's mother is the one who exposed herself to an accessory charge by convening the meeting and saying, look, everyone, let's all talk. Here's the name of a lawyer. Here's the number of a lawyer. Don't say anything. Lay low. Act as if everything is normal. Kennedy. And is it also true that during that conversation, the mother to these three other people, that she actually turned to Perez and said, you understand that you are at risk, too, for having taken the bag up to Nevada City? So essentially, there must have been, I would suppose, some implicit discussion about how the offense took place and what Perez's role was. Not that he was at the crime scene, but that, in fact, he was an accessory after the fact by taking the bag up. Absolutely, Judge Sessions. And the first part of what you're saying, that she knew sort of what happened, was if you remember, she grabbed, I can't remember now if it was Lauren's arm or Tessie's arm, and said that that nigger shot someone. So she knew what had gone down. But again, that testimony is from one of the Perez circle of people. True. It was the Perez family members who talked about Jeanette's York involvement. But I would point out that in her declaration that was submitted for habeas, you would think that she would not only explain her role in the alibi, but she'd also say, oh, and by the way, this is how I would explain whether this did happen, whether this didn't happen, what I really meant to do. Oh, I was really looking out for Perez. I think that to the jury, there's no reason why York and his mother would be trying so hard to get rid of evidence of this crime, and Perez isn't. I mean, there's no testimony at all about Perez doing anything to cover up the crime relative to York and his mother. He brought this bag to Nevada City. Sure. I'm sorry, I shouldn't say, I overstated. There is, if you compare the evidence of what he did to the evidence of what York and his mother did, and again, his mother is putting herself out there on an accessory charge, it isn't reasonable for a jury to conclude that, oh, they were doing all this to protect Perez instead of to protect York. That's a huge weight in favor of York's culpability. Kennedy, was there also evidence that York changed his appearance when he went up to Nevada City? That's true, Judge Sessions, that's another factor. Was that introduced during the course of the trial or not? It was, Judge Sessions. And I think actually his mother, in her declaration, the habeas petition, I believe that she actually tries to explain that away by either denying that he was changing appearance or explaining that, oh, that's sort of what he does. If this robbery had been York's idea, but he wasn't there, and then he helped cover it up, would he have been eligible for the same sentence if all his involvement was was suggesting the idea and helping to cover it up? I don't believe so. I don't believe he would have been in for the special circumstance. And is there anything... It's felony murder, right? So are you suggesting that he would not be culpable on this particular offense if he was just planning it out but didn't actually walk into the place? I believe he'd be culpable for the felony murder, so for first-degree murder, but not necessarily for the robbery-murder special circumstance, which would have bought him the life without parole sentence. Well, it's still a serious offense. Absolutely, Judge Berzon. In terms of why he would want to cover it up. True, Judge Berzon, but I still think that it remains a mystery, though, why they are trying harder than Perez. It seems like they are doing more. And that, I think, is the mystery of the judges who have still been faced with. Well, there's, I mean, is there any reason why the mother wouldn't try to help him cover up something that could give him life in prison? I don't really understand this argument that the mother wouldn't be trying to protect him, even if all he had tried to do is cover it up without it being his idea in the first place. I mean, it seems like the testimony and the mother's behavior is very consistent with this other story of his role. Except that wasn't, that's not even Appellant's story to this day. Appellant's story is, I only got involved after the fact. I didn't know anything about this going on beforehand. So you would have to not only disbelieve Perez, you'd also have to disbelieve Appellant's own record. So what if he was only involved after the fact? What would he be eligible for as a crime then? An accessory charge, which is far short of first degree murder, Judge Friedland. The final thing I'd like to mention before. Was the shooter there after the fact? So this, I'm trying to understand this testimony about being with the black guy when things went, you know, is it impossible that that's about the coverup? I don't believe there's any testimony about Moorhead participating in the coverup activities or to what extent he did. And he's never been apprehended. So we don't know, Judge Friedland. I'm still concerned about the closing argument and the cell phone records. And what was said was by the prosecutor, and I wish we had cell phone records. I wish we had telephone records to corroborate that. But, and then he says, you're talking about cell phone records, numbers change. It could be very difficult. So we've got to go with what we've got. We don't have that. And the prosecutor had to have known that wasn't true, or a prosecutor had to have known that wasn't true. So, Judge Burson. And now the, the, the, here the defense witness did object, but not on the ground that there really were cell phone records. And Judge Burson, I think that, I don't know if this answer will be satisfying to you, but I think that if you carefully listen to what the prosecutor said, he said, I wish we had cell phone records to corroborate that. He didn't have cell phone records to corroborate that. That is the truth. He goes, I wish we did, but we don't. And I, I, I see the look on your face, Judge Friedland, and I understand that he is, that he escaped it. I wish we had cell phone records, is what he said. To corroborate that, I believe is what he said. The second sentence is, I wish we had the telephone records to corroborate that. I mean, anybody listening to that would think that there were no cell phone records. And I think that there is an argument he made that he was, that he was at least skating the line. And all this does is exacerbate the prejudice in the sense that the, the defense lawyer also should have known that there were cell phone records. And in fact, he did, over the weekend, figure it out. But at the time it was done, he didn't object on that ground. And the admonition was an erroneous admonition, i.e., an admonition that there were no cell phone records, rather than that, in, in, in fact, they were wrong about there not being any. And so, we have, it just means that this whole question of the cell phone records is not only itself, it's not only the absence of the information, it's the stressing towards the jury, and it's the jury's interest in it. So, it's really, you know, in terms of the focus on this, and its importance, it's basically as high as one can be in, in this kind of a case. And then the question becomes, you know, what's on the other side? But in terms of the importance of it, it seems, you know, undeniably extreme. I would agree that it was important again. All right, your time is up. Thank you very much. Very helpful. Thank you. So, the, the first thing I wanted to respond to was respect to Mr. Hart's testimony. And this is the first time actually that the state has acknowledged that those, at least in the briefing and, and, and whatnot before, those two statements did come a half a day apart. It wasn't as though Hart said, yeah, this shit went bad and he was with a black guy. He didn't say it like that, but that's how the state's been presenting it. Also, it's worth looking at, if you actually do look at Hart's testimony. Meaning what? He didn't say. He, there was two separate statements. In the, in the, at one point in the day, he said shit went bad, and then later on he said, he said that he was with a nig when it happened, I think. And so what is your interpretation of how to reconcile those statements? Well, I think Mr. Hart's testimony is just rife with error anyway. If you, I mean, Hart, first of all, he admitted he was smoking marijuana all day. He admitted he was trying to stay away from this situation, didn't want to know what was going on. He also talked about how Perez and York were talking with one another all day. They were both upset. He even got it wrong because he thought that Logan Lackey and Perez had arrived at the property together, when in fact it was Anderson and Perez. So I, I don't think his testimony is, is very reliable. Certainly, when you, as, as Judge Berzon was saying, if you take the, the very, you know, central importance of the 3 AM call, and you try and put Hart's or Penny Morales' testimony against it, to me, there's no question that the 3 AM call occupies a far more serious place in this case than those, those witnesses. I- But Hart said that when he, that when it went down, that's the guy he was talking about, the black person. When it went down, there was a black person with him. Who said that? Kenny. So I don't understand what you mean about it being two, a day, half a day apart. If you, it's actually very confusing. I didn't recognize it until I went back and read the testimony as well. The, it's a very convoluted track to get to that point where the prosecutor is asking about that particular statement, and it becomes sort of commingled. There is a place, and, and I don't have my brief with me right now. I cited it in the reply brief where you can see where those two statements are, are made, and he actually says it was separated by about a half a day. It is confusing. Okay. It is. Okay. One more sentence? Okay. Thank you. Thank you very much. Thank you both for a useful argument in an interesting case. Is this not on? No, it just wasn't close enough. Oh, I'm sorry. York v. Ducart is submitted. We'll go on to Victor v. Bigelow and Kasson v. Bigelow, which will be argued together.
judges: Berzon, Friedland, Sessions